**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CARMIGNAC GESTION, S.A.,** | |
| *Plaintiff*, | |
| v. | **Civil Action No. 17-10467** |
| **PERRIGO COMPANY PLC, JOSEPH C. PAPA, and JUDY L. BROWN,** | |
| *Defendants.* | |
| **FIRST MANHATTAN CO.,** | |
| *Plaintiff*, | |
| v. | **Civil Action No. 18-2291** |
| **PERRIGO COMPANY PLC, JOSEPH C. PAPA, and JUDY L. BROWN,** | |
| *Defendants.* | |
| **MANNING & NAPIER ADVISORS, LLC,** | |
| *Plaintiff*, | |
| v. | **Civil Action No. 18-674** |
| **PERRIGO COMPANY PLC, JOSEPH C. PAPA, and JUDY L. BROWN,** | |
| *Defendants.* | |

[Caption Continued on Next Page]

<table>
<tr>
<td>

**NATIONWIDE MUTUAL FUNDS, on behalf of its series NATIONWIDE GENEVA MID CAP GROWTH FUND and NATIONWIDE S&P 500 INDEX FUND, and NATIONWIDE VARIABLE INSURANCE TRUST,**

*Plaintiffs*,

v.

**PERRIGO COMPANY PLC, JOSEPH C. PAPA, and JUDY L. BROWN,**

*Defendants*.

</td>
<td>

Civil Action No. 18-15382

</td>
</tr>
</table>

**ARLEO, UNITED STATES DISTRICT JUDGE**

In this opinion, the Court considers the viability of claims raised by four plaintiffs that opted out of a putative class action predicated upon alleged violations of federal securities laws. Plaintiffs Carmignac Gestion, S.A. ("Carmignac"), Manning & Napier Advisors, LLC ("Manning"), First Manhattan Co. ("First Manhattan"), and Nationwide Mutual Funds along with Nationwide Variable Insurance (collectively "Nationwide" or, together with Carmignac, Manning, and First Manhattan, "Plaintiffs") brought four separate but related lawsuits against Defendants Perrigo Company PLC ("Perrigo" or the "Company"), Joseph C. Papa ("Papa"), and Judy L. Brown ("Brown" or, together with Perrigo and Papa, "Defendants").[1] Currently pending before this Court are Defendants' Motions to Dismiss certain claims in each action. Docket No. 17-10467 ("Carmignac Docket") at ECF No. 41; Docket No. 18-674 ("Manning Docket") at ECF No. 40;

---

[1] Plaintiffs Carmignac, Manning, and First Manhattan also named Marc Coucke as a defendant. The claims against Coucke were voluntarily dismissed in all three actions. See Carmignac Docket Report, No. 17-10467 at ECF No. 18; Manning Docket Report, No. 18-674 at ECF No. 17; First Manhattan Docket Report, No. 18-2291 at ECF No. 16.

Docket No. 18-2291 ("First Manhattan Docket") at ECF No. 39; Docket No. 18-15382 ("Nationwide Docket") at ECF No. 15. All four Motions are opposed. Carmignac Docket at ECF No. 44; First Manhattan Docket at ECF No. 42; Manning Docket at ECF No. 43; Nationwide Docket at ECF No. 29.

Plaintiffs bring securities fraud claims based on alleged misrepresentations and omissions Defendants made to investors in order to falsely inflate Perrigo's stock value in the face of a hostile tender offer from a competitor. For the reasons set forth herein, the Motions are **GRANTED IN PART** and **DENIED IN PART**.

I.      FACTS AND PROCEDURAL HISTORY

    A.  The Parties

Plaintiffs are corporate entities that either purchased Perrigo stock on behalf of investors or advised investors in connection with the purchase of Perrigo stock.[2] In each action, the claims arising from the securities purchases have been assigned to or otherwise lie with the named Plaintiffs. Carmignac Compl. ¶¶ 39-41; Manning Compl. ¶¶ 46-48; First Manhattan Compl. ¶¶ 46-48; Nationwide Compl. ¶¶ 46-73.

Defendant Perrigo is a publicly-traded company that manufactures specialty, generic, and over-the-counter ("OTC") pharmaceutical and healthcare products. Carmignac Compl. ¶ 44; Manning Compl. ¶ 49; First Manhattan Compl. ¶ 49; Nationwide Compl. ¶ 74. Defendant Joseph

---

[2] Plaintiff Carmignac served as the management company for numerous related entities in connection with their purchases of Perrigo stock. See Carmignac Compl. ¶ 39. Plaintiff Manning is a portfolio management company that purchased Perrigo stock on behalf of various funds during the relevant period. Manning Compl. ¶ 46. Plaintiff First Manhattan is an SEC-registered investment advisor and/or broker-dealer that advised clients in connection with purchases and decisions regarding Perrigo stock. First Manhattan Compl. ¶¶ 46-48. The Nationwide Plaintiffs are funds that purchased Perrigo stock during the relevant period. Nationwide Compl. ¶ 44.

Papa served as Perrigo's Chief Executive Officer ("CEO") and as Chairman of its Board of Directors from 2006 to April 2016. Carmignac Compl. ¶ 45; Manning Compl. ¶ 50; First Manhattan Compl. ¶ 50; Nationwide Compl. ¶ 75. Defendant Judy Brown served as Perrigo's Chief Financial Officer ("CFO") from 2006 to February 2017. Carmignac Compl. ¶ 46; Manning Compl. ¶ 51; First Manhattan Compl. ¶ 51; Nationwide Compl. ¶ 76.

**B. The Mylan Bid**

In November 2014, Perrigo announced that it had entered into an agreement to acquire Omega Pharma, N.V. ("Omega"), which was the fifth-largest European OTC healthcare company at that time. Carmignac Compl. ¶¶ 5, 61; Manning Compl. ¶¶ 6, 68; First Manhattan Compl. ¶¶ 6, 68; Nationwide Compl. ¶¶ 6, 92. Very shortly after the Omega deal closed, in April 2015, pharmaceutical conglomerate Mylan made an unsolicited bid to purchase Perrigo for approximately $205 per share. Carmignac Compl. ¶ 69; Manning Compl. ¶ 76; First Manhattan Compl. ¶ 76; Nationwide Compl. ¶ 100. Perrigo rejected Mylan's offer and announced that the bid "substantially undervalue[d] the Company and its future growth prospects." Carmignac Compl. ¶ 75; Manning Compl. ¶ 82; First Manhattan Compl. ¶ 81; Nationwide Compl. ¶ 105. After increasing its bid two times, Mylan proceeded with a formal tender offer. See Carmignac Compl. ¶¶ 143, 152; Manning Compl. ¶¶ 204, 213; First Manhattan Compl. ¶¶ 203, 212; Nationwide Compl. ¶¶ 210, 219. Plaintiffs allege that Defendants made material misrepresentations to investors in an effort to prevent Perrigo shareholders from accepting Mylan's offer.

Perrigo's shareholders ultimately rejected the tender offer on November 13, 2015. Carmignac Compl. ¶¶ 29, 158; Manning Compl. ¶¶ 35, 219; First Manhattan Compl. ¶¶ 35, 219; Nationwide Compl. ¶¶ 34, 225. Approximately two months after the tender offer failed,

Defendants announced Perrigo's fourth quarter and 2015 calendar year financial results, which were lower than projected. Carmignac Compl. ¶¶ 162-63; Manning Compl. ¶¶ 337, 339; First Manhattan Compl. ¶¶ 223-24; Nationwide Compl. ¶¶ 229-230. Perrigo stock continued to fall over the course of the next few months. By December 2016, stock values had declined from $140.54—the price at which it was valued when Mylan's offer was rejected—to $81.95. See Carmignac Compl. ¶¶ 159-88; Manning Compl. ¶¶ 221-239; First Manhattan Compl. ¶¶ 220-47; Nationwide Compl. ¶¶ 226-53.

On April 25, 2016, Perrigo announced that Papa had resigned as the Company's CEO. Carmignac Compl. ¶ 173; Manning Compl. ¶ 224; First Manhattan Compl. ¶ 232; Nationwide Compl. ¶ 238. That same day, Perrigo lowered its 2016 earnings guidance by more than 12% and issued a statement attributing the adjustment in part to "a reduction in pricing expectations in [Perrigo's] Rx segment due to industry and competitive pressures." Carmignac Compl. ¶ 174; Manning Compl. ¶ 225; First Manhattan Compl. ¶ 233; Nationwide Compl. ¶ 239. Brown resigned from the Company in 2017. Carmignac Compl. ¶¶ 46, 318; Manning Compl. ¶¶ 51, 411; First Manhattan Compl. ¶¶ 51, 431; Nationwide Compl. ¶¶ 76, 378.

### C. Relevant Misrepresentations and Omissions

Defendants' alleged misrepresentations and omissions relate to a number of issues that impacted Perrigo's financial stability and growth potential. Those allegations form the basis for the claims in the related putative class action, Roofer's Pension Fund v. Papa, 2:16-cv-2805, and are outlined in Section I.D, infra. The claims asserted by the class action plaintiffs substantially overlap with the claims Plaintiffs allege in the instant four individual actions. Relevant to the pending Motions to Dismiss, Plaintiffs raise new claims alleging that Defendants misrepresented

and concealed the impact of increased competition and downward pricing pressure on Perrigo's generic drug revenues.

In the 1980s, Congress enacted legislation designed to reduce generic drug prices and expedite the approval process. See Carmignac Compl. ¶ 118; Manning Compl. ¶ 125; First Manhattan Compl. ¶ 124; Nationwide Compl. ¶ 148. Under the legislation, new generic drugs are afforded a 180-day exclusivity period during which they face no competition. Carmignac Compl. ¶ 120; Manning Compl. ¶ 127; First Manhattan Compl. ¶ 126; Nationwide Compl. ¶ 150. The first generic drug is typically priced approximately fifteen to twenty percent lower than the equivalent brand-name drug. Carmignac Compl. ¶ 120; Manning Compl. ¶ 127; First Manhattan Compl. ¶ 126; Nationwide Compl. ¶ 150. At the conclusion of the exclusivity period, generic competitors enter the market and increase supply, causing prices to decrease until they reach an equilibrium price point. This equilibrium point can be as low as ten to twenty percent of the brand-name drug's original price. Carmignac Compl. ¶ 120; Manning Compl. ¶ 127; First Manhattan Compl. ¶ 126; Nationwide Compl. ¶ 150.

After accumulating an extensive backlog of generic drug approvals, the Food and Drug Administration ("FDA") began approving a record number of generic drugs in or around April 2015. Carmignac Compl. ¶¶ 123-27, 130; Manning Compl. ¶¶ 130-34, 137; First Manhattan Compl. ¶¶ 129-33, 136; Nationwide Compl. ¶¶ 153-57, 160. Between April 2015 and December 2015, the FDA approved at least nine generic drugs that were competitors of Perrigo products. Carmignac Compl. ¶ 128; Manning Compl. ¶ 135; First Manhattan Compl. ¶ 134; Nationwide Compl. ¶ 158.

Plaintiffs allege that from April to October 2015, Defendants made multiple misrepresentations about the status and sustainability of Perrigo's generic drug pricing.

Specifically, Plaintiffs allege that Defendants Papa and Brown repeatedly told investors during conference calls and at conferences that Perrigo sought to keep its generic drug prices "flat to up slightly." Carmignac Compl. ¶¶ 267, 270, 272, 276; Manning Compl. ¶¶ 320, 323, 325, 331, 335; First Manhattan Compl. ¶¶ 336, 341, 343, 351, 355; Nationwide Compl. ¶¶ 321, 324, 326, 332, 336. When asked during an August 5, 2015 earnings call how the "price increase dynamic" was impacting Perrigo and "how sustainable" Papa believed the increases to be, Papa apparently made no mention of the increased competition. See Carmignac Compl. ¶ 274; Manning Compl. ¶ 327; First Manhattan Compl. ¶ 345; Nationwide Compl. ¶ 328. Papa instead stated that Perrigo's team had "done a great job at looking at pricing . . . across the portfolio," that the Company believed it had "a strong Rx business," and that it would "look to still find some additional pricing opportunities in the future." Carmignac Compl. ¶ 274; Manning Compl. ¶ 327; First Manhattan Compl. ¶ 345; Nationwide Compl. ¶ 328. During an October 22, 2015 earnings call, Papa dismissed an analyst's observation that the financial markets had "become very concerned about the price inflation component of growth" with respect to drug prices. Papa again stated that the Company's strategy was to "keep pricing flat to up slightly." Carmignac Compl. ¶ 157, 276; Manning Compl. ¶ 218; First Manhattan Compl. ¶ 218; Nationwide Compl. ¶ 224. During that same call, Defendant Brown advised that "nearly all of [Perrigo's] revenues are insulated from the current pricing drama you see playing out in the pharmaceutical industry today." Carmignac Compl. ¶ 277; Manning Compl. ¶ 331; First Manhattan Compl. ¶ 352; Nationwide Compl. ¶ 333.

Confidential witnesses have reported that Perrigo, like other drug companies, monitored competitors' new product development. Carmignac Compl. ¶ 133; Manning Compl. ¶ 140; First Manhattan Compl. ¶ 139; Nationwide Compl. ¶ 163. According to CW-8, Perrigo maintained a running list of which companies were applying for new generic drug approvals and kept track of

product development for drugs that would compete with existing Perrigo products. Carmignac Compl. ¶¶ 133-34; Manning Compl. ¶¶ 140-41; First Manhattan Compl. ¶¶ 139-40; Nationwide Compl. ¶¶ 163-64.

Plaintiffs allege that, contrary to Defendants' assurances about the stability and sustainability of Perrigo's generic drug prices, the Company's Rx segment was negatively impacted by the influx of generic drug approvals. Plaintiffs further allege that Perrigo acknowledged the financial ramifications caused by "a reduction in pricing expectations in our Rx segment due to industry and competitive pressures" only a few months after Brown assured investors that Perrigo was "insulated" from the "pricing drama." See Carmignac Compl. ¶ 174; Manning Compl. ¶ 225; First Manhattan Compl. ¶ 233; Nationwide Compl. ¶ 239.

### D. Roofer's Pension Fund v. Papa

The related putative class action lawsuit, Roofer's Pension Fund v. Papa, Docket No. 2:16-cv-2805, was filed in May 2016 against Perrigo and a number of individual defendants including Papa and Brown.[3] The parties in the instant four actions entered into stipulations, all of which provide that the rulings contained in the Court's July 27, 2018 decision in Roofer's Pension Fund v. Papa shall apply with equal force to the pending motions to dismiss.[4] Carmignac Docket at ECF

---

[3] An Amended Complaint was filed on June 21, 2017. Docket No. 2:16-cv-2805 ("Roofer's Pension Fund Docket") at ECF No. 89 ("Roofer's Pension Fund Am. Compl.").

[4] The parties stipulated and agreed that "[t]he issues and arguments raised in the briefing in connection with the Motions to Dismiss in [Roofer's Pension Fund] shall not be re-briefed," but instead "shall be treated as if such issues and arguments had been raised in [the instant] motion(s) to dismiss . . . and had been resolved in a similar fashion to the way those issues and arguments were resolved in the July 27, 2018 Decision." All four Plaintiffs agreed to dismiss all claims relating to "Perrigo's financial guidance and/or the Tysabri royalty stream." Carmignac Docket at ECF No. 30; First Manhattan Docket at ECF No. 20; Manning Docket at ECF No. 29; Nationwide Docket at ECF No. 6 (collectively, "the Stipulations"). First Manhattan and Manning agreed to dismiss all Section 18 claims except those relating to alleged price-fixing of generic drugs, while Carmignac agreed to dismiss all Section 18 claims. See the Stipulations.

No. 30; First Manhattan Docket at ECF No. 20; Manning Docket at ECF No. 29; Nationwide Docket at ECF No. 6.

Like the claims in the individual actions, the claims in the class action stem from alleged material misrepresentations and omissions that the defendants made in an effort to overvalue Perrigo and prevent its shareholders from accepting Mylan's offer. Roofer's Pension Fund v. Papa, No. 16-2805, 2018 WL 3601229, at *3 (D.N.J. July 27, 2018). The misrepresentations and omissions relate to the following four areas: (1) the value of a royalty stream for the drug Tysabri; (2) Perrigo's organic growth rates; (3) collusive pricing for generic drugs; and (4) the integration of Omega. Id.

The four-count Amended Complaint alleges violations of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), and the Israel Securities Law, 1968 against all the defendants, and of Section 20(a) of the Exchange Act against numerous individual defendants including Papa and Brown. Roofer's Pension Fund Am. Compl. ¶¶ 282-308. Defendants moved to dismiss the Amended Complaint. On July 27, 2018, this Court issued a written opinion in which it granted in part and denied in part the defendants' motion. The substance and the disposition of the claims are summarized below.

### 1. Tysabri Royalty Stream

After Perrigo merged with the Irish pharmaceutical company Elan in 2013, it acquired a financial interest in a multiple sclerosis treatment called Tysabri. Roofer's Pension Fund, 2018 WL 3601229, at *2-3. The plaintiffs alleged that the defendants concealed the deteriorating value of the royalty stream through the use of improper accounting practices. Id. at *3, 10. The plaintiffs argued that the defendants accordingly made material misrepresentations when they certified compliance with the generally accepted accounting principles ("GAAP"). Id. The plaintiffs also

alleged that the defendants consistently misrepresented that the fair value of the royalty stream exceeded the carrying value.  Id. at *3, 9.  This Court rejected the defendants' truth on the market defense, but dismissed the claims relating to the Tysabri royalty stream without prejudice for failure to sufficiently plead scienter.  Id. at *9, 20.

## 2. Generic Drug Pricing

During the six quarters that preceded the Class Period, Perrigo's generic drug division was the Company's most profitable operating segment.  Id. at *3.  The plaintiffs allege that Perrigo engaged in a price-fixing scheme with other generic drug manufacturers, and that the defendants made material misrepresentations that omitted their price-collusion practices.  Id. at *3, 10.  The plaintiffs allege that the defendants instead simultaneously indicated that Perrigo's strategy was to keep pricing "flat to up slightly."  Id.  After consideration of the "plus factors"—whether the plaintiffs had put forth evidence showing: (1) "that the defendant had a motive to enter into a . . . conspiracy"; (2) "that the defendant acted contrary to its interests"; (3) an implication of "a traditional conspiracy"—this Court concluded that the plaintiffs sufficiently alleged the collusive pricing misconduct.  Id. at *10-11.  The defendants argued that their statements about keeping generic drug pricing "flat to up slightly" were not misrepresentations when viewed in the context of their entire portfolio of products, and that statements about the competitiveness of the generic drug market were inactionable puffery.  Id. at *12.  The Court rejected both arguments, finding that "once Defendants[] chose to speak about generic drug pricing, they could not omit material facts related to that issue so as to make the disclosure misleading."  Id. (internal quotation marks omitted).  The Court further found that the following allegations were collectively sufficient to raise a strong inference of scienter: (1) statements made by Defendants Papa and Brown and their responses to specific questioning, which indicated firsthand knowledge; (2) the magnitude of the

scheme; and (3) the existence of a parallel criminal investigation. Id. at *22. The plaintiffs' price-fixing claims were therefore permitted to proceed.

### 3. Organic Growth

While Papa was Perrigo's CEO, the Company made specific representations and projections about its ability to grow organically. Id. at *4, 12-13. In early 2014, Papa stated that half of Perrigo's four-year historical growth was organic. Id. at *4. He also represented that Perrigo targeted a future organic growth rate of 5-10%. Id. at *12. However, the plaintiffs' forensic accounting expert determined that Perrigo's actual organic growth rates during the six quarters preceding the Class Period were just over 1%, and were negative in two quarters. Id. at *4. The plaintiffs alleged that the defendants concealed the Company's deteriorating organic growth rates by blending older higher growth periods with newer lower ones in order to plausibly claim confidence in the Company's ability to grow organically at a rate inconsistent with its more recent financial figures. Id. at *4, 12-13.

The defendants argued that their organic growth statements were factually accurate and therefore inactionable. Id. at *12. The Court rejected the defendants' arguments and found that "[i]n touting their consistent ability to maintain organic growth rates in the 5-10% range and proclaiming that their 'strong durable base' would allow for continued consistent growth, Perrigo assumed a duty to disclose that recent performance fell substantially below the target range." Id. at *13. However, the Court ultimately dismissed the plaintiffs' organic growth claims without prejudice for failure to demonstrate that the defendants acted with scienter. Id. at *22.

### 4. Omega Integration

Shortly before the commencement of the Class Period in 2015, Perrigo acquired Omega— one of the largest OTC healthcare companies in Europe. Id. at *4. The plaintiffs allege that the

defendants misrepresented the success of Omega's integration and inflated Omega's growth prospects while omitting numerous known impediments.  Id. at *4-5.  The defendants argued that their statements indicating the integration's success were mere "status reports," and that "[n]o reasonable investor" could have believed that the integration had been successfully completed in the short timeframe that had passed.  Id. at *13.  The Court rejected the defendants' argument, again noting a company's obligation to disclose all known material facts once it chooses to address an issue.  Id. at *14.

The defendants also argued that certain statements addressing Omega's efficiency and the quality of its management team constituted inactionable puffery.  Id.  The Court agreed.  Id. at *14-15.  The Court dismissed the Omega claims predicated upon statements including puffery and forward-looking statements, but sustained the claims based upon misrepresentations relating to the past and present success of the integration.  Id. at *15.

### E.  The Instant Individual Actions

On November 1, 2017, Carmignac filed a securities fraud Complaint against Defendants based on the same allegations that give rise to the claims in the related class action.  Carmignac Docket at ECF No. 1.  Plaintiffs Manning, First Manhattan, and Nationwide subsequently filed separate, similar actions against Defendants.  Manning Docket at ECF No. 1; First Manhattan Docket at ECF No. 1; Nationwide Docket at ECF No. 1.  Plaintiffs' claims are largely duplicative of the claims asserted in the related class action.  Because of the Stipulations, those duplicative claims are not at issue in the pending Motions to Dismiss.

Relevant to the pending Motions, all four Plaintiffs raised new claims relating to Perrigo's generic drug pricing.  Under the new theory, Plaintiffs allege that Defendants violated securities laws by making misrepresentations and omissions to investors about the stability and sustainability

of Perrigo's drug pricing, while failing to disclose increased competition and downward pricing pressure in the generic drug market. Manning and First Manhattan also maintain new claims for violations of Section 18 of the Exchange Act, alleging that Perrigo made misrepresentations that concealed its participation in an anti-competitive price-fixing scheme. Although the price-fixing allegations were addressed in <u>Roofer's Pension Fund</u>, they were not examined in the context of Section 18. Defendants now move to dismiss the Section 18 claims raised by First Manhattan and Manning and all claims premised upon Perrigo's alleged failure to adequately disclose the increased competition in the generic drug market.

## II.   LEGAL STANDARDS

### A.  Standards for Rule 12(b)(6) Motion to Dismiss

Under Federal Rule of Civil Procedure 8, a pleading is sufficient so long as it includes "a short and plain statement of the claim showing that the pleader is entitled to relief" and provides the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). In considering a Rule 12(b)(6) motion to dismiss, the court accepts all of the facts in the complaint as true and draws all reasonable inferences in favor of the plaintiff. <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 231 (3d Cir. 2008). Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." <u>Id.</u>

However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555. The allegations in the complaint "must be enough to raise a right to relief above the speculative level." <u>Id.</u> Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual

basis such that it states a facially plausible claim for relief.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### B.  Standard for Securities Fraud

In addition to the customary pleading requirements under Rule 8, plaintiffs alleging securities fraud must meet the heightened pleading requirements set forth by the Private Securities Litigation Reform Act ("PSLRA").  See City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 166 (3d Cir. 2014).  The PSLRA requires plaintiffs "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).  This standard "requires plaintiffs to plead the who, what, when, where and how" of the alleged fraud.  Inst. Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009).  In order to sufficiently allege scienter, a plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A strong inference exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, 551 U.S. at 324.  With these principles in mind, the Court turns to the substance of Plaintiffs' securities fraud claims.

### III.  ANALYSIS

Plaintiffs allege that Defendants violated Sections 10(b), 14(e), 18, and 20(a) of the Exchange Act.

### A.  Section 18

Plaintiffs First Manhattan and Manning allege that Perrigo falsely represented in its financial disclosure forms that the Company operated in competitive environments when, in fact, it was engaged in an anti-competitive price-fixing scheme.  First Manhattan and Manning allege

that their reliance on these statements gives rise to Section 18 liability.  See Manning Compl. ¶¶ 435-40; First Manhattan Compl. ¶¶ 461-66.

Section 18 "creates a private remedy for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC."  Discovery Glob. Citizens Master Fund, Ltd. v. Valeant Pharm., Int'l, Inc., Civ. Nos. 16-7321, 16-7324, 16-7328, 16-7494, 16-7496, 16-7497, 2018 WL 406046, at *3 (D.N.J. Jan. 12, 2018) (citing 15 U.S.C. § 78r(a)); In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 283 (3d Cir. 2006) (citing 15 U.S.C. § 78r(a)).  In order to state a Section 18 claim, a plaintiff must plead "actual, as opposed to presumed, reliance upon on a false or misleading statement."  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d at 283.  A Section 18 claim does not require that defendants acted with scienter or any particular state of mind.  Discovery Glob. Citizens Master Fund, 2018 WL 406046, at *3.

In Roofer's Pension Fund, this Court sustained other claims predicated upon Plaintiffs' price-fixing allegations.  2018 WL 3601229, at *10-11.  In so ruling, the Court concluded that Plaintiffs adequately pled that the statements constituted material misrepresentations.  Id.  That finding applies here pursuant to the Stipulations entered into by the parties.  Defendants argue that dismissal is still warranted on two grounds:  (1) the challenged statements are inactionable because they were not contained in SEC filings; and (2) Plaintiffs have failed to adequately plead reliance.  Defs.' Br. at 9 (Carmignac Docket, ECF No. 41.1; Manning Docket, ECF No. 40.1; First Manhattan Docket, ECF No. 39.1; Nationwide Docket, ECF No. 15.1).

First Manhattan and Manning both allege that they relied on statements contained in Perrigo's 2015 Form 10-K and February 2016 Form 10-KT when making stock-purchasing decisions.  See Manning Compl. ¶ 437; First Manhattan Compl. ¶ 463.   First Manhattan and

Manning specifically allege that Perrigo made the following misrepresentations in both disclosure forms: that its Generic Rx division "operate[d] in a highly competitive environment"; that the Company "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of Perrigo's products"; and that "[t]he market for Rx pharmaceuticals is subject to intense competition from other generic drug manufacturers." Manning Compl. ¶¶ 329; 339; First Manhattan Compl. ¶¶ 347, 359. First Manhattan and Manning further allege that Perrigo listed Actavis (a/k/a Allergan), Glenmark, Mylan, Sandoz, and Taro— companies alleged to have participated in the price-collusion scheme—"as among its 'generic drug manufacturer competitors.'" Manning Compl. ¶ 329, 339; First Manhattan Compl. ¶ 347, 359; see Manning Compl. ¶ 33; First Manhattan Compl. ¶ 33.

In its Section 18 claim, First Manhattan and Manning allege that they "specifically read and relied upon the statements made by Defendants in Perrigo's SEC filings including, but not limited to, the Company's statements in those filings set forth above." Manning Compl. ¶ 437; First Manhattan Compl. ¶ 463. First Manhattan and Manning further allege that they "reasonably relied upon Perrigo's statements as being materially complete, and as not omitting material information, including information concerning . . . generic drug pricing." Manning Compl. ¶ 438; First Manhattan Compl. ¶ 464.

Defendants argue that First Manhattan and Manning's Section 18 allegations are "generalized and conclusory" and are therefore insufficient to support a Section 18 claim. See Defs.' Br. at 11. The Court disagrees. Although courts in this District have noted that pleading reliance on generalized "categories of items relied on" is insufficient to support a Section 18 claim, see LLDVF, L.P v. Dinicola, Civ. No. 09-1280, 2010 WL 3210613, at *11 (D.N.J. Aug. 12, 2010) (citing Witriol v. Conexant Sys., Inc., Civ. No. 04-6219, 2006 WL 3511155, at *7 (D.N.J. Dec. 4,

2006)), those cases are distinguishable from the circumstances here. In <u>LLDVF</u> and <u>Witriol</u>, the plaintiffs apparently failed to identify <u>any</u> specific statements to support their Section 18 claims. Here, in contrast, First Manhattan and Manning identified specific misleading statements[5] set forth in Perrigo's Forms 10-K and 10-KT upon which they allegedly relied. The Court finds these allegations sufficient to state a Section 18 claim. <u>See</u> <u>Senzar Healthcare Master Fund, L.P. v. Valeant Pharm., Int'l, Inc.</u>, Civ. No. 18-2286, 2018 WL 4401730, at *4 (D.N.J. Sept. 14, 2018) (denying motion to dismiss Section 18 claim where plaintiffs identified allegedly false statements in Forms 10-K and 10-Q which "touted the company's 'organic' growth and omitted the alleged fraudulent scheme," and pled "eyeball reliance on these statements"). The Court accordingly declines to dismiss the Section 18 claims asserted by First Manhattan and Manning at this juncture.

### B. Section 10(b) and Rule 10b-5, Section 14(e), and Section 20(a)

Section 14(e) is modeled after Section 10(b), and Section 20(a) is a derivative claim predicated on a finding of liability under Section 10(b). Thus, the analysis of the Section 10(b) claims is the threshold for determining whether the remaining Exchange Act claims will proceed.

Section 10(b) addresses fraud in connection with the sale of securities. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." <u>City of Edinburgh Council</u>, 754 F.3d at 167. Only the first two

---

[5] Although those statements are not explicitly re-alleged in the Section 18 Counts of the Complaints, First Manhattan and Manning incorporated the statements by reference. Manning Compl. ¶¶ 437-38; First Manhattan Compl. ¶¶ 463-64 (both alleging that Plaintiffs "specifically read and relied upon the statements made in Perrigo's SEC filings including, but not limited to, the Company's statements in those filings set forth above" and further alleging that they "relied upon Perrigo's statements as being materially complete, and as not omitting material information, including information concerning . . . generic drug pricing.").

elements—material misrepresentation or omission and scienter—are at issue in the instant Motions.

The elements of a Section 14(e) claim are the same as a 10b–5 claim, the only difference is that Section 14(e) arises in connection with a tender offer, while rule 10b–5 arises in connection with a purchase or sale of a security.  <u>See</u> <u>In re Digital Island Sec. Litig.</u>, 357 F.3d 322, 328 (3d Cir. 2004) ("Because of the similarity in the language and scope of Section 14(e) and Rule 10b-5, we have in the past construed the two consistently.").

Section 20(a), in turn, provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

Section 20(a) is a derivative cause of action predicated upon § 10(b) liability.  <u>In re Aetna, Inc. Sec. Litig.</u>, 617 F.3d 272, 285 (3d Cir. 2010).  In order for liability to attach, "the defendant must have been a culpable participant in the act or acts constituting the violation or cause of action."  <u>Belmont v. MB Inv. Partners, Inc.</u>, 708 F.3d 470, 484 (3d Cir. 2013) (internal quotation marks omitted).

Here, Defendants argue that their public statements are inactionable and that Plaintiffs fail to demonstrate that Defendants acted with scienter.

### 1.  Material Misrepresentations

To demonstrate a material misrepresentation or omission, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The "allegations cannot rely exclusively on hindsight, but must be sufficient to show that the challenged statements were actionally unsound when made."  Williams v. Globus Med., Inc., 869 F.3d 235, 244 (3d Cir. 2017) (internal quotation marks omitted).  A misstatement or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision."  In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 783 (3d Cir. 2009) (internal quotation marks omitted).  In other words, the materiality standard is met if the information "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  SEC v. Huang, 684 F. App'x 167, 172 (3d Cir. 2017) (internal quotation marks omitted).

"Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."  EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000).  Such statements "constitute no more than puffery and are understood by reasonable investors as such."  In re Aetna Sec. Litig., 617 F.3d at 283 (internal quotation marks omitted).

The ultimate issue of materiality should not be decided as a matter of law unless "the disclosures or omissions are so clearly unimportant that reasonable minds could not differ."  In re Galena Biopharma, Inc. Sec. Litig., 336 F. Supp. 3d 378, 390 (D.N.J. 2018).  The Third Circuit has warned that the task of determining materiality can be especially difficult when the challenged statement contains "soft" information, i.e., statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts.  In re Craftmatic Sec. Litig., 890 F.2d 628, 642 (3d Cir. 1989).  However, "complaints alleging securities fraud often contain claims of omissions or misstatements that are

obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

### a. Defendants' Public Statements about Drug Pricing

The material misrepresentations and omissions set forth in Section I.C, supra, form the basis for Plaintiffs' claims.

### i. Truth on the Market Defense

Defendants argue that the Company "repeatedly disclosed" that its generic drug prices were affected by increased competition, rendering the challenged statements immaterial and therefore inactionable. Defs.' Br. at 14. Defendants highlight the following disclosures Perrigo made about drug pricing and competition: that its generic drug division "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of [its] products"; that "[t]he market for Rx pharmaceuticals is subject to intense competition from other generic manufacturers"; and that its generic drug division "may experience increased price competition as other generic companies produce the same product or introduce new drugs and/or drug delivery techniques that make [its] current products less desirable." Id. These disclosures were made in Perrigo's August 2015 10-K and February 2016 10-KT. Id.

As this Court noted in Roofer's Pension Fund, in order to prevail with a truth on the market defense, the corrective information must be "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." 2018 WL 3601229, at *9 (internal quotation marks omitted). At the motion to dismiss stage, a defendant "must establish [the truth on the market] defense as a matter of law on the basis of the allegations" in the complaint in order to warrant dismissal. In re

Enzymotec Sec. Litig., Civ. No. 14-5556, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015). The "truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." Id. In Roofer's Pension Fund, this Court also emphasized that "[t]he law does not permit corporate executives to mislead investors through half-truths." 2018 WL 3601229, at *13.

The Court finds that Defendants' disclosures about the possibility of increased competition (e.g., that Perrigo "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products"; that Perrigo's generic drug division "may experience increased price competition") were not conveyed with the "degree of intensity and credibility" necessary to counterbalance their repeated and consistent prior statements that signaled to investors that Perrigo's pricing strategy was sustainable. See also In re Novo Nordisk Sec. Litig., Civ. No. 17-209, 2018 WL 3913912, at *5-6 (D.N.J. Aug. 16, 2018) (finding public disclosure that "the U.S. price environment [would] become more challenging" insufficient to counteract representations that the company was "insulate[d] . . . from pricing pressures"); cf. Avaya, 564 F.3d at 270 (finding securities fraud liability where the defendant "acknowledged that [the defendant entity] inhabited a competitive industry and offered discounts to some customers on some products and services," because he failed to disclose that the company "engaged in massive discounting").

First, Defendants consistently stated an intention to keep drug prices stable both before and after the August 2015 10-K was filed. After the 10-K was filed, Brown also stated that Perrigo's revenues were "insulated from the current pricing drama." Moreover, based on the allegations in the Complaints, Defendants were facing more than the possibility of increased competition when the 10-K disclosures were filed. Plaintiffs' allegations indicate that Perrigo was instead already

facing increased competition.  See Carmignac Compl. ¶ 128; Manning Compl. ¶ 135; First Manhattan Compl. ¶ 134; Nationwide Compl. ¶ 158 (alleging that the FDA approved at least nine generic drugs that competed directly with Perrigo products between April 2015 and December 2015).  Accepting the pleadings as true, Defendants understated the rising level of competitiveness in the generic drug market.  Moreover, Defendants continued to make statements about keeping pricing "flat to up slightly" even after the release of Perrigo's August 2015 10-K and did not qualify such statements with the information about increased competition in the generic market. Affording Plaintiffs the benefit of all favorable inferences, the Court finds Defendants 10-K disclosures insufficient to establish a truth on the market defense at this stage.

### ii. Plaintiffs' New Drug Pricing Theory is Not Inconsistent with their Price-Collusion Allegations

Defendants argue that Plaintiffs' new theory about increased competition in the generic drug market is inconsistent with the price-fixing claims, which were sustained in Roofer's Pension Fund.  In essence, Defendants contend that Plaintiffs cannot plead fraud on the grounds that Defendants simultaneously concealed increased and decreased competition.  Defs.' Br. at 15. Plaintiffs counter that the two theories are "wholly consistent" and that "[p]ricing pressure is part and parcel of price collusion."  Pls.' Br. at 17-18 (Carmignac Docket, ECF No. 44; Manning Docket, ECF No. 43; First Manhattan Docket, ECF No. 42; Nationwide Docket, ECF No. 29). The Court rejects Defendants' arguments.

Perrigo manufactured more than 800 generic drugs.  Plaintiffs theorize that Perrigo engaged in price collusion for certain drugs to counterbalance the downward pricing pressures resulting from increased competition for other products.  In light of the vast number of drug products Perrigo manufactures, the Court finds it plausible that the Company could have faced and concealed increased competition with respect to some products, while engaging in price collusion

with respect to other products.  Based on the pleadings, the Court finds that Plaintiffs' two drug-pricing theories are not mutually exclusive and declines to dismiss Plaintiffs' new claims on those grounds.

### iii. Brown's Statement that Perrigo's Revenues Were "Insulated from the Current Pricing Drama"

Defendants argue that Plaintiffs have misconstrued Defendant Brown's statement about Perrigo's "insulat[ion] from the current pricing drama . . . playing out in the pharmaceutical industry."  Defs.' Br. at 16.  Plaintiffs submit that Brown's statement led investors to believe that Perrigo was insulated from any negative impact that would result from the influx of approvals in the generic drug market.  See Pls.' Br. at 18.  Defendants argue that Brown's statement instead referred to Turing Pharmaceutical's decision to "dramatically increase" the price of a rare drug used by AIDS patients, which was widely publicized in the days before the conference call.  Defs.' Br. at 16.  Defendants argue that Brown's statement was, in any event, "too vague to induce reliance by a reasonable investor."  Id. at 17.  The Court disagrees.

Plaintiffs allege that in the months leading up to Defendant Brown's statement, the FDA was accelerating generic drug approvals.  See Carmignac Compl. ¶¶ 123-27, 130; Manning Compl. ¶¶ 130-34, 137; First Manhattan Compl. ¶¶ 129-33, 136; Nationwide Compl. ¶¶ 153-57, 160.  Plaintiffs further allege that the influx of new generic drugs increased competition and created downward pricing pressure for some of Perrigo's products.  Brown's statement that Perrigo's revenues were "insulated from the current pricing drama . . . playing out in the pharmaceutical industry today"[6] coupled with the facts Plaintiffs pled about the record-high number of generic

---

[6] To the extent that Defendants seek to rely on facts beyond the pleadings in order to ascribe a different meaning to Brown's statement, those arguments are more appropriate for consideration at a later stage in the litigation.

drug approvals is sufficiently specific to plead a material misrepresentation. The Court rejects Defendants' arguments to the contrary.

### iv. Safe Harbor

Defendants argue that Papa's statements that the Company intended to "keep pricing flat to up slightly" are inactionable forward-looking statements. See Defs.' Br. at 17-19. The Court finds the safe harbor provision inapplicable.

The PSLRA imposes additional burdens with respect to allegations involving forward looking statements. The PSLRA's safe harbor provision, 15 U.S.C. § 77z-2, "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." Avaya, 564 F.3d at 254. However, this safe harbor provision does not apply to a "mixed present/future statement . . . with respect to the part of the statement that refers to the present." Id. at 255 (internal quotation marks omitted). So the PSLRA's safe harbor provision does not apply to the extent Plaintiffs sufficiently allege that Defendants omitted present facts from the challenged statements. See Curran v. Freshpet, Inc., No. 16-2263, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018).

Plaintiffs allege that Defendants made the following misleading statements about Perrigo's drug pricing strategy: (1) during an April 21, 2015 conference call, Papa stated that he was "very comfortable that, certainly in our current calendar 2015, as we look to the future, we can keep pricing flat to up slightly," Carmignac Compl. ¶ 267, Manning Compl. ¶ 320, First Manhattan Compl. ¶ 336, Nationwide Compl. ¶ 321; (2) during a May 12, 2015 conference, Papa indicated that he had tried in the past eight to nine years "to keep pricing flat to up slightly," Carmignac Compl. ¶ 270, Manning ¶ 323, Nationwide ¶ 324, First Manhattan Compl. ¶ 341; (3) during a June

2, 2015 conference, Papa stated that Perrigo "tr[ies] to . . . take a holistic view across [Perrigo's] total portfolio[] and keep pricing flat to up slightly," Carmignac Compl. ¶ 272, Manning Compl. ¶ 325, First Manhattan Compl. ¶ 343, Nationwide Compl. ¶ 326; (4) during an October 22, 2015 conference call, Papa stated that the "overall comment is flat to up slightly for our pricing," Carmignac Compl. ¶ 276, Manning Compl. ¶ 331, First Manhattan Compl. ¶ 351, Nationwide Compl. ¶ 332; and (5) during a January 5, 2016 conference, Papa stated that he "strive[s] very hard to achieve . . . pricing flat to up slightly," Manning Compl. ¶ 335, First Manhattan Compl. ¶ 355, Nationwide Compl. ¶ 336. Although some of these statements are prefaced with forward-looking language and may be construed as projecting future drug-pricing strategies, all of the statements reflect the Company's <u>present</u> and past strategy of keeping prices flat to up slightly. The statements accordingly cannot constitute forward-looking statements for safe harbor purposes because they omit existing facts that bear on the pricing strategy projections, <u>i.e.</u>, the increased competition resulting from the influx of generic drug approvals. <u>See</u> <u>In re Majesco Sec. Litig.</u>, Civ. No. 05-3557, 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) ("[A]llegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act." (internal quotation marks omitted)).

Even if the statements were forward looking, safe harbor would not apply. The PSLRA's first safe harbor protects statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); <u>see</u> 15 U.S.C. § 78u-5(c)(2)(A). Defendants argue that Plaintiffs' statements about pricing strategy are inactionable in light of the 2015 10-K's disclosures about competition in the drug market. Specifically, Defendants argue that they "warned investors" that the "'pricing of its products' might be threatened by 'vigorous

competition from other pharmaceutical companies,' including, specifically, that its generic prescription drug division 'may experience increased price competition as other generic companies produce the same product or introduce new drugs and/or drug delivery techniques that make our current products less desirable,'" and that its "'current and future competitors may develop products comparable or superior to those offered by [Perrigo] at more competitive prices.'" Defs. Br. at 17 (quoting 2015 10-K).

The Court finds the 10-K disclosures insufficient to constitute meaningful cautionary language. Although cautionary language need not directly accompany a challenged statement, there must be some attempt to incorporate the cautionary language "by reference" as part of the challenged statement. See In re Hertz Glob. Holdings, Inc. Sec. Litig., Civ. No. 13-7050, 2017 WL 1536223, at *14 (D.N.J. Apr. 27, 2017), aff'd, 905 F.3d 106 (3d Cir. 2018). While Papa noted in some of the challenged statements that the market was "competitive," the Court finds these disclosures too general to warrant safe harbor protection. At the May 12 conference, Papa stated, "[o]bviously it's a competitive market out there" and noted that "[t]here is always going to be—in a pricing world somebody is going to gain some share, somebody is going to lose some share." Carmignac Compl. ¶ 270; Manning Compl. ¶ 323; First Manhattan Compl. ¶ 341; Nationwide Compl. ¶ 324. At the June 2 conference, Papa acknowledged that he would have to decrease the price of "some products in Rx" "for competitive reasons," and that the Company would also increase some. Carmignac Compl. ¶ 272; Manning Compl. ¶ 325; First Manhattan Compl. ¶ 343; Nationwide Compl. ¶ 326. Papa made similar statements at the January 5 conference. Manning Compl. ¶ 335; First Manhattan Compl. ¶ 355; Nationwide Compl. ¶ 336. Papa's statements warn generally that markets can be competitive, but fail to disclose specific facts about increased competition that existed at the time he was making pricing projections. The Court finds that Papa's

disclosures fail to meet the "extensive and specific" requirement of the safe harbor provision, and are more akin to "mere boilerplate disclaimers that warn generally of risks." See Kelley v. Aerie Pharm., Inc., Civ. No. 15-3007, 2016 WL 3437603, at *4 (D.N.J. June 20, 2016).

In any event, Defendants rely on Perrigo's 10-K disclosures rather than these contemporaneous statements in arguing for safe harbor protection. The Court finds that the 10-K disclosures were too attenuated from Papa's statements about pricing strategy, and accordingly fail to warrant application of the safe harbor provision.

Finally, for the reasons expressed in Section III.B.2, infra, the Court finds that the Defendants acted with actual knowledge of the increased competition and downward pricing pressures facing the generic drug market. Accordingly, the second safe harbor provision is inapplicable.

### b. Defendants' Statements to First Manhattan

Defendants also move to dismiss with respect to certain statements that First Manhattan alleges were made directly to its investors. First Manhattan alleges that during an April 22, 2015 conference call with its investors, Papa "characterized the pipeline for generic Rx business as the Company's 'best ever,'" and stated that "no competitors ha[d] filed on several key products." First Manhattan Compl. ¶ 339. First Manhattan also alleges that during a meeting with its representatives on September 30, 2015, Brown misled investors when she advised that Perrigo's "Generic Rx business is a defensible asset" because "there are few competitors in Perrigo's niche generic topical segments, and there is a high cost of entry due to more stringent requirements for clinical trials." Id. ¶ 349.

Defendants argue that these statements are all inactionable as puffery or as too vague to induce reliance. See Defs.' Br. at 20-21. Defendants further argue that First Manhattan has failed

to sufficiently allege that the statements were false.  Id.  The Court finds that First Manhattan has abandoned its claims with respect to these challenged statements, as it presents no arguments in opposition to dismissal.  See Yucis v. Sears Outlet Stores, LLC, Civ. No. 18-15842, 2019 WL 2511536, at *4 (D.N.J. June 18, 2019) (granting motion to dismiss as to claims that "Plaintiff abandoned . . . because she did not respond to Defendant's arguments on those claims or mention them at all in her brief").  In any event, the Court agrees with Defendants that First Manhattan has failed to allege falsity.  Accordingly, the claims based on these challenged statements shall be dismissed.

### 2.  Scienter

Defendants argue that Plaintiffs fail to adequately allege scienter.  Plaintiffs counter that they adequately pled scienter based on:  (1) repeated misrepresentations by Papa and Brown indicating knowledge about the facts misrepresented; (2) Papa's and Brown's access to information as Perrigo's top executives, including information supplied by confidential witnesses about Perrigo's practice of monitoring competitors' product development; (3) the fact that the alleged misstatements involved a core operation of the Company; (4) the magnitude of the alleged fraud; and (5) the resignations of Papa and Brown.  For the reasons expressed below, the Court finds that these allegations collectively raise a strong inference of scienter.

Scienter is defined as the intent "to deceive, manipulate, or defraud."  See Tellabs, 551 U.S. at 313 (internal quotation marks omitted).  In order to sufficiently allege that a defendant acted with scienter, "each act or omission alleged to violate [Section 10(b)] [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  To allege a "strong inference of scienter from circumstantial evidence," a plaintiff "must sufficiently plead 'Defendants' knowledge of facts or access to

information contradicting their public statements . . . . [i.e., that] Defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc., 720 F. Supp. 2d 517, 553 (D.N.J. 2010) (quoting In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 599 (D.N.J. 2001)). The Third Circuit permits a plaintiff to satisfy this requirement by alleging strong circumstantial evidence of either conscious or reckless behavior. See Avaya, 564 F.3d at 267; GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004). A plaintiff alleging conscious misbehavior must "stat[e] with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." Hull v. Glob. Dig. Sols., Inc., Civ. No. 16-5153, 2017 WL 6493148, at *20 (D.N.J. Dec. 19, 2017) (internal quotation marks omitted). In order to establish a strong inference of scienter arising from reckless conduct, a plaintiff must allege a misstatement "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." Avaya, 564 F.3d at 268 n.42 (internal quotation marks omitted). A reckless statement "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. (internal quotation marks omitted). Claims "essentially grounded on corporate mismanagement" are insufficient to plead recklessness. Id. (internal quotation marks omitted).

In evaluating whether a complaint meets the scienter requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." Tellabs, 551 U.S. at 314. A "strong" inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. "The inference . . . need not be irrefutable, i.e., of the smoking-gun

genre, or even the most plausible of competing inferences." Id. at 324 (internal quotation marks omitted). "Omissions and ambiguities 'count against inferring scienter.'" PharmaNet, 720 F. Supp. 2d at 548 (quoting Tellabs, 551 U.S. at 326). A court must consider the entirety of a complaint in determining "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." Tellabs, 551 U.S. at 322-23; see Avaya, 564 F.3d at 273.

Accordingly, the Court will address each alleged basis for scienter and all reasonable opposing inferences of non-fraudulent intent. The Court will then consider the Complaint as a whole in determining whether Plaintiffs have pled facts to support a strong inference of scienter.

### a. Motive

Defendants first argue that Plaintiffs fail to plead facts that establish a motive to engage in fraudulent conduct. In Roofer's Pension Fund, this Court found that the plaintiffs failed to plead facts that established a "particularized motive." 2018 WL 3601229, at *18. The same reasoning applies here. However, the Court found that allegations of conscious misbehavior collectively raised a strong inference of scienter with respect to the price collusion allegations. Although some variable factors alter the analysis with respect to allegations regarding increased competition in the generic drug market, many of the key scienter allegations are common between the two drug-pricing claims.

### b. Evidence of Conscious Misbehavior or Recklessness

### i. Confidential Witnesses

First, Defendants argue that the information supplied by the confidential witnesses does not support a finding of scienter. The Court disagrees. According to the Complaints, former Perrigo employees revealed the following. Perrigo maintained a "running list" that included

forthcoming Perrigo products and "identified companies in competition with Perrigo" to obtain approval for new generic drugs. The generic drug group also tracked the progress of new products that would compete with Perrigo products when introduced into the market. One confidential witness explained that the Rx division "needed this information so it could plan sales and pricing." Confidential witnesses also engaged in conversations with supervisory-level employees about the pricing pressure caused by the increased competition in the generic market in 2015.

Defendants make several arguments as to why the confidential witness allegations fail to support a finding of scienter. None of them are availing.

First, Defendants argue that the witnesses' statements do not contradict Defendants' statements, as Defendants never denied keeping track of competitors' product development. Defs.' Br. at 24-25. Whether or not Defendants admitted that the Company kept track of such information is immaterial to the scienter calculus. The relevant inquiry is whether or not such record keeping indicates that Defendants were aware of or recklessly disregarded the downward pricing pressure when speaking about the sustainability of drug pricing.

Next, Defendants submit that Plaintiffs failed to connect the information supplied by the confidential witnesses to Defendants Papa and Brown. Id. at 25-27. Because the confidential witnesses did not report to or otherwise interact with Papa or Brown, Defendants argue, the information is too attenuated to support a finding of scienter. The Court disagrees. The fact that the confidential witnesses did not have contact with Papa and Brown does not render their statements immaterial to the scienter analysis. In Institutional Investors Group v. Avaya, Inc., the Third Circuit noted that while a "direct link" between the defendants and the confidential witnesses "would fortify Shareholders' allegations," "plaintiffs' allegations of scienter need not be irrefutable." 564 F.3d at 269.

In Avaya, the Court considered confidential witness reports in finding a strong inference of scienter, despite the absence of "any particular document or conversation that would have informed [the individual defendants] of [the facts misrepresented]." Id. at 268-69. The Avaya panel noted that statements made by the company's CFO supported a finding of scienter where the CFO made specific, misleading statements in response to numerous inquiries about competition in the market. 564 F.3d at 270 (finding scienter even if CFO was not aware of the "full extent" of the pricing structure or the "entirety of the other circumstances alleged" because the repeated competition inquiries "made obvious the risk" that his statements could mislead investors). In finding a strong inference of scienter, the Avaya panel considered the confidential witness reports—which demonstrated the widespread nature of the pricing policy at issue—in conjunction with the misleading statements the CFO made in response to competition inquiries. Here, like the CFO in Avaya, Defendants made statements about the sustainability of Perrigo's pricing strategy in response to repeated inquiries about competition in the drug market. See infra. The Court likewise finds it appropriate to consider the information supplied by the confidential witnesses together with the statements made by Defendants.

### ii. Defendants' Misrepresentations Indicating Knowledge of Facts Misrepresented

Second, Plaintiffs argue that Defendants Papa and Brown made repeated misrepresentations that indicated knowledge about drug pricing and competition in the market. Specifically, Plaintiffs argue that Papa and Brown "repeatedly represented that 'the prices for Perrigo's prescription drugs in the U.S., including generics, were sustainable,'" that Perrigo was "insulated" from the "current pricing drama," and that Perrigo sought to maintain a strategy of keeping drug prices "flat to up slightly." Pls.' Br. at 25. In Roofer's Pension Fund, this Court found that Papa and Brown's statements about drug pricing indicated knowledge on the topic and

therefore supported a finding of scienter. The Court noted that, while "merely addressing [a] question related to a topic is insufficient to demonstrate scienter[,] [t]he content and context of Defendants' responses to these questions may . . . weigh in favor of finding scienter." Roofer's Pension Fund, 2018 WL 3601229, at *21 (internal quotation marks omitted). The Court found that "Papa and Brown . . . repeatedly responded to pointed analyst questions regarding pricing pressure in the Generic Rx division," and that "their answers indicated personal knowledge of the subject." Id. Moreover, the Court found that repeated inquiries from analysts and investors about drug pricing "would have made Defendants aware of the importance of generic drug pricing to the investing public." Id.; see Avaya, 564 F.3d at 270-71 (noting that a defendant can act with scienter even when he or she is "not aware of the full extent of [the misrepresented fact], or the entirety of the other circumstances alleged" "as long as what he knew made obvious the risk" that his statements could mislead investors).

Defendants ambiguously acknowledged "competition" and pricing fluctuation in the drug market, but failed to specify that the FDA was approving generic drug applications at a record rate, and failed to appropriately qualify their representations about pricing sustainability and stability. Moreover, Papa was asked about increased market competition on at least two occasions during the relevant period. As noted above, on April 21, 2015, Papa was asked to comment on generic drug pricing and whether changes to the industry would impact Perrigo's business. Papa responded that Perrigo intended to "keep pricing flat to up slightly." On August 5, 2015, he fielded an inquiry about how Perrigo was affected by the "price increase dynamic" and "how sustainable" he believed the price increases to be. Papa responded that the Company's "team ha[d] done a great job looking at pricing . . . . across the portfolio" and that they "believed there [were] still opportunities to do pricing." Papa further stated that the Company believed it had "a strong Rx

business" and would "look to still find some additional pricing opportunities in the future." On October 22, 2015, in response to an inquiry about an analyst's observation that the "financial markets have become very concerned about the price inflation component of growth on the generic and brand side going forward," Papa restated the Company's strategy to "keep pricing flat to up slightly." During that same call, Brown advised that the Company was "insulated from the current pricing drama."[7]

Based on the pleadings, neither Papa nor Brown disclosed the increased market competition in response to those inquiries. Defendants' verbal statements and Perrigo's 10-K disclosures about drug pricing further support the conclusion that Defendants were aware of the increased competition in the generic drug market and failed to disclose the impact it could have on Perrigo's pricing strategy. Defendants vaguely argue that their statements about drug pricing— the same statements that this Court found to indicate knowledge and support an inference of scienter in Roofer's Pension Fund—are somehow insufficient to support the same conclusion in this case. For the reasons expressed above, the Court disagrees.

### iii. Core Operations Doctrine

Under the core operations doctrine, material misrepresentations concerning "'core matters' of central importance to a company" may support an inference of scienter when accompanied by "some additional allegation of specific information conveyed to management and related to the fraud." Martin v. GNC Holdings, Inc., 757 F. App'x 151, 155 (3d Cir. 2018) (quoting Avaya, 564 F.3d at 263). Allegations that fraud related to a high-earning segment of a company have been

---

[7] The Court recognizes that Brown made far fewer statements about drug pricing than Papa according to the allegations in the Complaint. However, Brown's singular statement about Perrigo's revenues being "insulated" from pricing pressures was so palpably reckless that the Court finds it sufficient, when considered collectively with the other scienter allegations, to satisfy the mental state standard at this stage.

found sufficient to support a core operations inference. See In re Toronto-Dominion Bank Sec. Litig., Civ. No. 17-1665, 2018 WL 6381882, at *17 (D.N.J. Dec. 6, 2018) (applying inference where relevant segment contributed over 60% of earnings); In re Urban Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015); see also Avaya, 564 F.3d at 271 ("The perceived importance of margins supports an inference that [Avaya's CFO] was paying close attention to these numbers.").

Here, Perrigo's generic drug division comprised 22% of its consolidated net sales in the 2015 fiscal year. Carmignac Compl. ¶ 304; Manning Compl. ¶ 395; First Manhattan Compl. ¶ 415; Nationwide Compl. ¶ 366. Analysts identified "intensifying competition and lower pricing" as among Perrigo's chief risks during the relevant period. Carmignac Compl. ¶ 304; Manning Compl. ¶ 395; First Manhattan Compl. ¶ 415; Nationwide Compl. ¶ 366. In light of the additional allegations that support an inference of scienter, the Court accordingly finds the core operation inference applicable here.

### iv.  Magnitude of the Alleged Fraud

Plaintiffs submit that they adequately pled scienter based on the "magnitude of the alleged fraud." Their sole argument in support of this finding is the Court's observation in Roofer's that Defendants "reaped hundreds of millions of dollars" from the alleged fraud. The Court's finding about the magnitude of the drug-pricing fraud in Roofer's Pension Fund is related to the anti-competitive price-collusion scheme, not to the concealment of increased competition at issue here. Although Plaintiffs allege that the two drug-price theories are related insomuch as Defendants might have been motivated to engage in price collusion as to some drugs in order to offset the effect that impending increased competition would have on other drugs, Plaintiffs have failed to make any allegations demonstrating the independent magnitude of the fraud alleged in the new

theory. Plaintiffs allege that at least nine generic drug products that compete directly with Perrigo products were approved between April and December 2015. However, Plaintiffs fail to allege facts that demonstrate the losses investors suffered as a result of Defendants' misleading omissions, such as, for example, the total revenues derived from the drugs affected by the increased competition. Accordingly, the Court concludes that the magnitude of the fraud, as currently pled, does not weigh in favor of finding scienter.

### v. Departures of Papa and Brown from the Company

Plaintiffs argue that the resignations of Papa and Brown further support an inference of scienter. In relation to the drug pricing allegations, the Court disagrees. Defendant Papa resigned as the Company's CEO in April 2016 to assume a CEO position at another pharmaceutical company. His resignation was announced on the same day the Company lowered its earnings guidance for 2016. The Company attributed the reduced projections in part to "a reduction in pricing expectations in our Rx segment due to industry and competitive pressures." Brown resigned a few months later, on the same day the Company announced it would open an investigation into improper accounting practices with respect to the Tysabri royalty stream. In Roofer's Pension Fund, the Court found "some probative value in Brown's resignation" with respect to the Tysabri royalty stream allegations. 2018 WL 3601229, at *20. The Court declined, however, to infer scienter from the resignation of the Company's Generic Rx division executive as it relates to the price collusion allegations. Id. at *22. The Court noted that the plaintiffs' complaint failed to allege, "for example, whether [the executive] was nearing retirement age, whether he left to pursue other opportunities, or even the length of his tenure." Id. (internal quotation marks omitted)

Here, Papa resigned from Perrigo to assume an executive position with a competitor. The mere fact that his resignation came on the same day that the Company reported lowered earnings guidance is insufficient to support an inference of scienter. The Court likewise declines to infer scienter on the basis of Brown's resignation. Although the Court found her departure probative of scienter in <u>Roofer's Pension Fund</u>, that finding related to the Tysabri royalty stream allegations, as her resignation was contemporaneous with an announcement regarding an investigation into improper accounting practices related to the royalty stream. Plaintiffs have failed to connect Brown's resignation, temporally or otherwise, to the drug-pricing allegations. Accordingly, the Court rejects Plaintiffs' argument that the resignations of Papa and Brown are probative of scienter with respect to the increased competition claims.

### vi. The Allegations Collectively Support a Strong Inference of Scienter

The Court finds that Defendants' statements indicating knowledge of drug pricing, the confidential witness statements, and the fact that the allegations of fraud relate to a core operation of the Company collectively give rise to a strong inference of scienter. Defendants acknowledge that this Court found that the plaintiffs in <u>Roofer's Pension Fund</u> sufficiently pled a strong inference of scienter. But Defendants argue that Plaintiffs' allegations with respect to the new drug pricing theory fall short of scienter in the absence of the parallel DOJ investigation and evidence indicating the magnitude of the scheme. The Court disagrees.

As noted above, Perrigo's drug revenues comprised a substantial segment of the Company's earnings in 2015. Defendants made repeated statements indicating that they had knowledge about the generic drug market and the Company's pricing strategy. Defendants not only made unprompted statements on pricing, but also responded to inquiries on multiple occasions about how the current status of the market, <u>i.e.</u>, the level of competition, would impact

Perrigo. The confidential witnesses indicated that Perrigo kept track of its competitors' product development, including the status of generic drug applications. To the extent that Defendants failed to access such important data, that failure demonstrates recklessness given its obvious relevance to the repeated inquiries from analysts and investors and the assurances Defendants made in response. The alternative inference is that Defendants were aware of the data and failed to disclose it when reassuring investors and analysts. Either scenario demonstrates scienter. Viewing Plaintiffs' allegations collectively, Plaintiffs have met their burden. See Tellabs, 551 U.S. at 323 (analyzing "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard").

## IV.    CONCLUSION

For all of the foregoing reasons, Defendants' Motions to Dismiss with respect to claims premised upon the statements made to First Manhattan representatives during the April 22, 2015 conference call and during the September 30, 2015 meeting are **GRANTED**. Defendants' Motions to Dismiss are **DENIED** with respect to all other claims.


Dated: July 31, 2019


*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**